582 A.2d 630

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. RALPH KIETT, JR., DEFENDANT–APPELLANT.

Argued September 12, 1989—Decided November 14, 1990.

*Lowell Espey*, Designated Counsel, argued the cause for appellant (*Alfred A. Slocum*, Public Defender, attorney; *Lowell Espey* and *William E. Norris*, former Designated Counsel, on the briefs).

*Lisa Sarnoff Gochman*, Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

WILENTZ, C.J.

Under a misapprehension that the death penalty was applicable to juveniles, defendant, Ralph Kiett, pleaded guilty to murder on September 17, 1985, pursuant to a plea bargain that removed the risk of the death penalty. He was seventeen when the crime was committed. After Kiett entered his plea and was sentenced to life imprisonment with thirty-years parole ineligibility, this Court determined that the Legislature never intend-

ed the capital punishment provisions of *N.J.S.A.* 2C:11–3 to apply to juveniles. *State v. Bey,* 112 *N.J.* 45, 95–105, 548 *A.*2d 846 (1988) (*Bey I*). The Appellate Division rejected defendant's request to withdraw his plea. We granted certification, 114 *N.J.* 470, 555 *A.*2d 598 (1989), limited to the issue of whether a juvenile's plea of guilty to murder, agreed to in order to avoid exposure to an inapplicable death penalty, can be withdrawn.

## I.

Nineteen-year-old Elizabeth Ann Coutee disappeared on the night of February 25, 1982. Six days later, her body, nude except for her socks, was found in a marshy area near Westend Avenue in Atlantic City. She had been stabbed twenty-eight times. The evidence that defendant committed the crime was overwhelming.

An Atlantic County grand jury returned two indictments against defendant. The first indictment charged him with knowing or purposeful murder by his own conduct (capital murder), in violation of *N.J.S.A.* 2C:11–3a(1) or (2); knowing or purposeful murder, in violation of *N.J.S.A.* 2C:11–3a(1) or (2); felony murder, in violation of *N.J.S.A.* 2C:11–3a(3); fourth-degree unlawful possession of a weapon, in violation of *N.J.S.A.* 2C:39–5d; third-degree possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4d; and two counts of first-degree aggravated sexual assault, in violation of *N.J.S.A.* 2C:14–2a(4) (use of weapon) and 2C:14–2a(6) (use of force resulting in severe personal injury). The second indictment (arising from his attempted escape) charged him with two counts of third-degree aggravated assault, in violation of *N.J.S.A.* 2C:12–1b(5)(a), and second-degree escape, in violation of *N.J.S.A.* 2C:29–5a. Jurisdiction was waived to the Law Division, and Kiett was prosecuted as an adult. *N.J.S.A.* 2A:4A–26; *R.* 5:9–5 (now *R.* 5:22–2). The prosecutor filed notice of aggravating factors under *N.J.S.A.* 2C:11–3c(2)(e), designating the matter as a capital case. The aggravating factors the prosecutor intend-

ed to prove were *N.J.S.A.* 2C:11–3c(4)(g), that the murder was committed during the commission of a felony (rape), and 2C:11–3c(4)(c), that the murder involved depravity of mind or an aggravated assault.

Kiett and the prosecutor negotiated a plea bargain. Kiett agreed to plead guilty to knowing and purposeful murder by his own conduct (capital murder) and second-degree escape. In return, the prosecutor agreed, in effect, not to seek the death penalty.[1] Rather, he would recommend a sentence of life imprisonment with thirty-years parole ineligibility for the murder charge, plus a consecutive ten-year sentence with five-years parole ineligibility for the escape charge, and dismiss the remaining counts of the indictments (the aggravated sexual assault charges, the weapons charges, and the aggravated assault charges arising from the escape).

Kiett then entered a plea of guilty to capital murder and escape. In accordance with the agreed-upon arrangement, he waived a jury for the penalty phase, allowing the court to determine whether the aggravating factors outweighed the mitigating factors, and ultimately whether he would be sentenced to prison or put to death. The court accepted the guilty plea, scheduled the matter for a penalty proceeding, and requested the defense counsel and the prosecutor to submit information regarding the aggravating and mitigating factors. Pursuant to this arrangement, if the trial court found in the penalty phase that the death penalty was appropriate, then Kiett would retract his guilty plea. Thereafter, assuming no other plea bargain, he would presumably have a trial by jury to determine guilt and, if convicted of the capital crime, a second sentencing proceeding in which the jury would determine whether the penalty would be death.

---

[1] Were this the actual agreement, it would appear to conflict with *N.J.S.A.* 2C:11–3d, which states that the penalty phase of a capital case "shall not be waived by the prosecuting attorney." As noted, the agreement is more complex.

In preparation for the penalty proceeding, the court reviewed a report submitted by the defense and the presentence report. Defense counsel, at the penalty proceeding, indicated that its report "summariz[ed] the material that *would have been* presented by the defense at the penalty phase of the trial in this matter...." (emphasis supplied). The prosecutor had not received a copy of this defense report before sentencing but stated nevertheless that he did not find this to be an "impediment for sentencing" and even suggested that the court sentence defendant "in accordance with" the report. The record is unclear about whether the prosecutor submitted a report on the aggravating factors. Aggravating factors were never described, much less proved, in the penalty proceeding, and on defense counsel's prompting that the court specifically enumerate the aggravating and mitigating factors for the record, the prosecutor responded that the aggravating factors "[a]re in the record." Neither the prosecutor nor the defense counsel made summations. Indeed, the entire proceeding was quite brief, the transcript being only twelve pages long.[2]

At the conclusion of the penalty hearing, the court found:

It is reasonable to conclude that the two aggravating factors do not, beyond a reasonable doubt, outweigh the mitigating factors of which there is evidence. Inasmuch as the defendant was a juvenile at the time of the offense, his age may be deemed a mitigating factor. [*N.J.S.A.* 2C:11–3c(5)(c).] His borderline mental retardation and substance abuse problems may be considered as having, to a significant degree, impaired his capacity to conform his conduct to the capacity of the law. [*N.J.S.A.* 2C:11–3c(5)(d).] The early childhood emotional and physical trauma experienced by him may have [sic] deemed to interfere with his character development so as to adversely impact upon his ability to live as a law-abiding citizen. [*N.J.S.A.* 2C:11–3c(5)(h).]

The court sentenced Kiett to life in prison, thirty-years parole ineligibility, for murder. The court indicated that the "reasons for the sentence in the case are that the sentence is imposed in

---

[2]On this record, it appears that the penalty proceeding was not what the Legislature intended. Given the critical importance of that proceeding, we have dealt with it separately at the conclusion of this opinion, *infra* at 493–499, 582 *A.*2d at 635–638, in order to provide guidance in future cases.

accordance with the plea agreement and after careful consideration of all the material available to the court, it is concluded that the recommended sentence is in the interest of justice and it is in accordance with the law as to the ... charge of murder."

## II.

■ *Rule* 3:9–2 states:

The court ... shall not accept such plea [of guilty] without first ... determining ... that there is a factual basis for the plea and that the plea is made voluntarily ... *and with an understanding of the nature of the charge and the consequences of the plea.* (Emphasis supplied.)

The court must be satisfied that the defendant understands the consequences of his or her guilty plea. "The right of the defendant to be informed of the consequences of his plea, however, extends only to those consequences that are 'direct,' or 'penal,' but not to those that are 'collateral.' " *State v. Howard*, 110 *N.J.* 113, 122, 539 *A.*2d 1203 (1988). That a defendant may be deported or lose a job as a result of the guilty plea has been held to be merely a collateral consequence. See *State v. Chung*, 210 *N.J.Super.* 427, 510 *A.*2d 72 (App.Div. 1986); *State v. Heitzman*, 209 *N.J.Super.* 617, 508 *A.*2d 1161 (App.Div.1986), *aff'd o.b.*, 107 *N.J.* 603, 527 *A.*2d 439 (1987). That a defendant was mistaken, however, about being subject to imposition of a period of parole ineligibility, or about the impact on parole arising from a sentence to the adult diagnostic and treatment center, has been deemed a direct or penal consequence, allowing for retraction of a guilty plea. See *State v. Howard, supra,* 110 *N.J.* 113, 539 *A.*2d 1203; *State v. Kovack,* 91 *N.J.* 476, 453 *A.*2d 521 (1982). In addition, "where the responsible arms of the judicial and law enforcement establishment, together with defendant's own counsel, have misinformed [the defendant] as to a material element of a plea negotiation, which the defendant has relied thereon in entering his plea, ... it would be manifestly unjust to hold defendant to his plea." *State v. Nichols,* 71 *N.J.* 358, 361, 365 *A.*2d 467 (1976) (citation omitted).

■ The potential penalties, especially the potential imposition of a death sentence, for the crimes for which defendant is charged are clearly penal consequences about which a defendant must be fully informed. If a defendant is misinformed about his or her eligibility for the death sentence, and if that misunderstanding is material to the plea, he or she cannot be deemed to have entered a guilty plea with a full understanding of the penal consequences.[3] In other words, a defendant who entered a guilty plea to avoid imposition of the death penalty, but who cannot be put to death as a matter of law, labors under the kind of mistake that entitles him or her to withdraw the plea. *R.* 3:21–1.

Kiett was a juvenile at the time the crime was committed. As this Court subsequently determined, the death penalty *never* applied to juveniles. *State v. Bey, supra,* 112 *N.J.* at 98, 548 *A.*2d 846 (*Bey I*). Although the 1982 Act reinstating the death penalty (*N.J.S.A.* 2C:11–3) was silent regarding its applicability to juveniles tried as adults,[4] "[i]t is clear to us that the Legislature never had intended to subject juvenile offenders to capital punishment. . . ." *Bey I, supra,* 112 *N.J.* at 98, 548 *A.*2d 846. The Act was amended in 1986 expressly to prohibit the execution of juveniles tried as adults. *L.* 1985, *c.* 478 (codified at *N.J.S.A.* 2C:11–3g).

---

[3]Before a guilty plea is accepted by the trial court, the defendant must sign the CPO114 form (formerly form LR–27), which is designed to inform the defendant of certain consequences of the guilty plea. In response to the question on the form about the potential maximum penalty for the murder charge, "Life" was written, then it was crossed out and "Capital offense" was written. In response to the question about the sentence the prosecutor would recommend, "Death penalty waived" was written, then it was crossed out and "State recommends NJSP—Life served 35" was written.

[4]Section c of *N.J.S.A.* 2C:11–3 states that "[a]ny person" could be subject to the death penalty. The defendant's age can be considered as a mitigating factor (2C:11–3c(5)(c)), which arguably implies that a juvenile could in fact be put to death.

In *Bey I*, this Court examined the applicability of the death penalty to a juvenile and determined that even if the Legislature had not amended the Act expressly to preclude the execution of juveniles, a juvenile would not be subject to its capital provisions. *Bey I, supra,* 112 *N.J.* at 98–101, 548 *A.*2d 846. We further found that "the Legislature intended the amendment to operate retroactively and apply to [Bey's] case; the legislative history ... speaks unmistakably of an intent to preclude the execution of *any* juvenile offenders under the 1982 Act." *Id.* at 101–02, 548 *A.*2d 846 (citations omitted). To erase any lingering doubt, we also noted that "notions of fundamental fairness, invoked by this Court in *State v. Biegenwald, supra,* 106 *N.J.* 13, 65–67, 524 *A.*2d 130, to order the retroactive application of a burden-of-proof amendment to section c, would likewise demand retroactive application of the juvenile-offender exemption in this case." *Bey I, supra,* 112 *N.J.* at 104, 548 *A.*2d 846. Therefore, because as a matter of law Kiett could not have been put to death, his plea of guilty, if it was entered to avoid the death penalty, was not made with a full understanding of its penal consequences.

Defendant must show that his mistaken belief about penal consequences was a material factor in the decision to plead guilty. *State v. Howard, supra,* 110 *N.J.* at 123, 539 *A.*2d 1203; *State v. Taylor,* 80 *N.J.* 353, 365, 403 *A.*2d 889 (1979). The necessary link establishing that Kiett's misapprehension led to his guilty plea is clear from the nature of the plea proceeding. Kiett pleaded guilty to capital murder and waived the jury for the penalty phase. Under the plea agreement, if the court, after balancing the aggravating and mitigating factors, imposed the death sentence, Kiett could withdraw his plea and proceed to trial. If, on the other hand, the court did not impose a death sentence, Kiett would be sentenced to life with thirty-years parole ineligibility for the murder and five more years of parole ineligibility for the escape. The result of the bargain was that the death penalty would not be imposed, at least not in the proceedings directly following the plea. The

following colloquy illustrates that the court, prosecutor, and defense counsel were all aware that Kiett's primary motive in entering the guilty plea was to avoid imposition of the death penalty:

Mr. Rosenberg [defense counsel]: Ralph would like to enter a plea of guilty to Count Two ... which charges him with murder, that being a capital offense where the State is seeking the death penalty.... He understands that there was a possibility that the jury could find him guilty and then, in the penalty phase, impose the death penalty.... He understands that in return for his plea of guilty [the State] is no longer seeking the death penalty....

\* \* \* \* \* \* \* \*

The Court: Do you understand that you're pleading guilty to charges, which as to murder committed by your own hand, the maximum penalty for that would be the death penalty.... Do you understand that?
Defendant: Yes.

\* \* \* \* \* \* \* \*

Mr. Garafola [prosecutor]: The State, by virtue of its agreement to date, does not seek to withdraw any of the aggravating factors, but is simply providing a vehicle through which the court could conduct the balancing test that the jury is constrained to do should the case, of course, go to trial and a jury finds him guilty of murder by his own conduct. Actually, the procedure that is envisioned, Your Honor, is that which was conducted by the court in [State v. Wright, 196 N.J.Super. 516, 483 A.2d 436 (Law Div.1984) ]. I would also advise the court that in considering the balance of the aggravating and mitigating factors, the State recognizes that there is not an insubstantial possibility that a jury, upon finding Mr. Kiett guilty of murder by his own conduct, would impose life imprisonment rather than a death sentence. The primary consideration, primary mitigating factor, Your Honor, being the ... defendant's age.

Avoiding the death penalty was a material factor in Kiett's decision to plead guilty. Because he entered his guilty plea relying on misinformation about his eligibility for execution, he may withdraw the plea.[5]

---

[5]Our statements that Kiett's plea was the result of "misinformation" or "misunderstanding" obviously refer to the fact that what he then reasonably believed to be the law was incorrect, but only because of subsequent developments, i.e., our later decision and the legislative amendment. Ordinarily the mistake that enables the defendant to void a plea concerns the facts or the law as they exist at the time of the plea. The unfairness of holding Kiett to the plea, however, is evident here whether the "mistake" related to existing law or a change in the law, even if that change was *not* retroactive, so long as its effect

## III.

The Appellate Division found that under the standard of manifest injustice, *Rule* 3:21-1, the burden on defendant, given his plea agreement, was too heavy to be overcome by a showing of misunderstanding of the penal consequences. The Appellate Division correctly noted that the evidence of Kiett's guilt was overwhelming, and that avoiding the death penalty may not have been the primary factor in defendant's decision to plead guilty.

██ For Kiett, avoiding the death penalty on this record clearly was one factor in his decision to plead guilty. Dismissal of the other counts may have been another factor. Indeed, it is possible that he might have pleaded guilty under this plea bargain regardless of the death penalty. In response, we hold that absent unusual circumstances, a defendant's belief, incorrect as a matter of law, that he was subject to the death penalty is sufficient basis for withdrawal of a guilty plea if the avoidance of the death penalty was a substantial factor in the decision to plead guilty.[6]

---

was to bar Kiett's execution—for instance under the principles of *State v. Biegenwald, supra,* 106 *N.J.* at 65–67, 524 *A.*2d 130, as extended in *State v. Davis,* 116 *N.J.* 341, 368–70, 561 *A.*2d 1082 (1989).

[6]We note that *Brady v. United States,* 397 *U.S.* 742, 90 *S.Ct.* 1463, 25 *L.Ed.*2d 747 (1970), and *Parker v. North Carolina,* 397 *U.S.* 790, 90 *S.Ct.* 1458, 25 *L.Ed.*2d 785 (1970), are similar to the case before us. In those cases the defendants sought collateral relief from their convictions several years after having pleaded guilty to capital crimes. Each had entered a guilty plea in part to avoid the risk of being exposed to the death penalty, which, under the statutes, could be imposed only by a jury. This type of statutory scheme, which reserves the death penalty only for those defendants who do not plead guilty and are tried by a jury, had been held unconstitutional in *United States v. Jackson,* 390 *U.S.* 570, 88 *S.Ct.* 1209, 20 *L.Ed.*2d 138 (1968), because it deters exercise of the sixth amendment right to demand a jury trial and discourages assertion of the fifth amendment right not to plead guilty. The death penalty therefore could not be imposed. In *Brady* and *Parker* the United States Supreme Court stated that its decision in *Jackson* did not, however, render all guilty pleas entered to avoid the death penalty inherently invalid, and refused

## IV.

◼ We refer again to the unusual procedure that followed defendant's plea, noted above at 486–488, 582 *A.*2d at 631–632. We realize it is essentially the same as that approved in *State v. Wright,* 196 *N.J.Super.* 516, 483 *A.*2d 436 (Law Div. 1984). In that case the procedure was authorized for the purpose of validating a plea bargain. The trial court ruled that under *Furman v. Georgia,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), when a defendant pleads guilty to capital murder on condition that the death penalty not be imposed, the court cannot accept the plea unless a penalty proceeding is held that results in a non-death outcome. *State v. Wright, supra,* 196 *N.J.Super.* at 526–27, 483 *A.*2d 436. The trial court concluded that without that validation of the plea, its acceptance posed the possibility of arbitrary application of the death sentence. *Id.* at 528, 483 *A.*2d 436. The penalty phase, therefore, is to be conducted as if it is genuine, just as if it actually determines life or death, defendant having the right, however, to withdraw the plea if death is the sentence. The immediate result of this type of proceeding is that a defendant who pleads guilty to capital murder and, following a penalty proceeding, is sentenced to death [7] will not be executed—indeed the procedure guarantees that he or she will not be executed.[8]

---

to grant collateral relief. *Parker, supra,* 397 *U.S.* at 795, 90 *S.Ct.* at 1461, 25 *L.Ed.*2d at 791; *Brady, supra,* 397 *U.S.* at 755, 90 *S.Ct.* at 1472, 25 *L.Ed.*2d at 760; *cf. Saffle v. Parks,* 494 *U.S.* ——, 110 S.Ct. 1257, 108 *L.Ed.*2d 415 (1990) (applying "general rule" of nonretroactivity of judicial decisions for cases on collateral review); *Butler v. McKellar,* 494 *U.S.* ——, 110 *S.Ct.* 1212, 108 *L.Ed.*2d 347 (1990) (same). While different considerations may obtain on direct, rather than collateral, review, the results in these cases appear to be inconsistent with our holding today.

[7]We assume the court (the penalty proceeding here and in *Wright* were to be held without a jury) would not actually sentence defendant to death but rather would indicate that but for the plea, death would have been the sentence.

[8]The dissent, *post* at 502, 582 *A.*2d at 639, labels as "untrue" this statement that "the procedure guarantees that he or she will not be executed." It points

We disapprove of this procedure. The penalty proceeding, instead of determining whether the death penalty shall be imposed, serves only as a validation (or rejection) of a previously-agreed-to plea bargain—as contemplated in *Wright*. The Legislature never intended the use of the penalty phase in this manner. We understand a trial court's willingness to accommodate the conclusion of both the State and defendant, that this defendant should not be exposed to the death penalty, and to accomplish that, as it did in *Wright*, in what it believed was a constitutionally acceptable procedure. We do not believe, however, that the Legislature ever intended any such procedure. Literally read, the statute requires, after a guilty verdict of capital murder, that there be a penalty proceeding—it even explicitly prohibits the prosecutor from waiving it. *N.J.S.A.* 2C:11-3d. Certainly the Legislature did not envision a penalty proceeding that was a charade, and although that may not have been the intent here, it was not the kind of penalty proceeding contemplated by the Legislature—namely, one that in fact, in reality, determined life or death. This penalty proceeding simply determined whether or not there might be another penalty proceeding. The court knew that it could not decide whether death was appropriate because even if it purported to, death would not be imposed. The unreality of the proceeding obviously affected the prosecutor, who presented no evidence of the aggravating factors, suggested the court sentence in accordance with a report submitted by defendant, and offered no

---

out the obvious, namely, that if the plea bargain is rejected, defendant will stand trial and indeed may thereafter be executed. That possibility is mentioned explicitly at several points in the majority opinion and is implicit throughout. The dissent further believes that "[t]he penalty trial in this case resulted in a valid sentence fully capable of being carried out. There was nothing illusory about that sentence." *Post* at 502, 582 *A.*2d at 640. There may have been nothing illusory about "that sentence"—since it confirmed the plea bargain—but there was something illusory about the proceeding itself since that which it purported to decide—life or death—it could *not* decide.

summation (neither did defense counsel).[9]

What we have said, and what we are about to say, concerning this procedure is not intended in any way as a criticism of the trial court in this case or in *Wright*. In both cases the court carefully and conscientiously sought to satisfy the requirements of both the United States Constitution and our death penalty act in a most difficult context, and sought to do so with due regard for all interests involved, the prosecutor's (who consented to the procedure), the defendant's, and especially the public's. Indeed, the trial court's determination in both cases to give effect to the intent of the statute was such that it would not accept a guilty plea even with the prosecutor's consent—it insisted on a hearing to determine for itself whether death was appropriate.

Nevertheless, we find the procedure that was used improper. In both cases the court purported to conduct an actual penalty proceeding, to balance all of the factors required to determine the life/death issue, and actually to decide that issue. In fact, despite the nature of that proceeding, what was decided was merely whether a guilty plea avoiding the death sentence should be accepted.

There is no more solemn proceeding in the justice system than the penalty phase of a capital murder case. It decides life or death. It may not be used for any other purpose. Conducting such a proceeding before a jury, allowing it to hear the evidence and deliberate on the most troubling question in our jurisprudence, imposing that incomparable burden on it, only to decide whether a plea bargain should be accepted, would be on its face unthinkable. It should be no less so when the proceeding is before a judge. The object—to determine what the

---

[9]The dissent, *post* at 511, 582 *A*.2d at 644, incorrectly attributes to the Court "disapprov[al] of [the] prosecutor for his decision not to pursue actively a death sentence in this case." There is simply no basis in our opinion for that attribution. We assume the prosecutor had good reason not to seek the death penalty.

fact-finder with the power to decree life or death would decide in a real proceeding—is impossible to attain: the capital punishment decision process is unique, it cannot be duplicated when the judge or jury is told that life is *not* at stake.[10] More than that, if such a procedure ever became widespread, the importance, solemnity, credibility, and finality of the real life or death penalty proceedings would inevitably be denigrated.

No implication is intended here about plea bargaining or any aspect of plea bargaining in capital cases other than the holding of an actual penalty proceeding in conjunction therewith. The issue of plea bargaining, as such, in its various forms, is not in any way before us. Our disapproval here extends only to the penalty proceeding that was conducted. The only capital cause penalty proceeding that may be held in this State is one that in fact determines whether the death penalty shall be imposed. No other is permissible.

## V.

We note the concern of the dissent that disapproval of this penalty phase procedure will restrict plea bargaining in capital causes. The dry-run penalty proceeding involved in this case is a rarity. Its prohibition will not affect plea bargaining in capital causes.

The dissent also relies on our recent amendment to *Rule* 3:9-3(c). That amendment does not contemplate involvement by the judiciary in plea bargaining in any way that suggests

---

[10]Critical to everything said in the dissent is its belief—unstated—that a reliable life/death determination can be made by a judge in a proceeding that does not decide that issue. But "[t]he determination of a life or death sentence in a capital case is an extraordinarily delicate and sensitive judgment." *State v. Hightower*, 120 *N.J.* 378, 439, 577 *A.*2d 99, 129 (1990) (Handler, J., concurring and dissenting). In addition to the fact-finding and weighing function is the transmutation of the community's conscience into a determination of life or death including "[t]he notion of 'mercy' ... based on a perception that does not encompass logical relevance to the ... penalty decision." *Id.* at 439, 577 *A.*2d at 129.

approval of this nonbinding penalty trial. That 1989 amendment merely permits the court to indicate a probable sentence based on representations of the prosecutor and defense counsel before a tentative plea agreement is reached. There is a world of difference between that involvement of the judiciary in plea bargaining and what is contemplated here—an actual trial, an actual penalty proceeding, and an actual—although false—determination of whether defendant shall live or die.

The impact of our decision on proportionality—another concern of the dissent—is similarly nil. This Court is in the process of studying that issue for the purpose of determining how it may properly discharge its responsibility to assure that any death penalty imposed is not "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3e. Our study is being conducted with the benefit of a knowledgeable consultant. We have conferred with representatives of the Attorney General, the prosecutors, the Public Defender, and the private defense bar at various stages in these proceedings, both to keep them informed and to get the benefit of their views, suggestions, and criticisms. At no point in this process—now in its third year—has anyone suggested that the procedure involved in this case is important to assure proportionality, or that it has any impact on it; indeed, no one has even mentioned it. The reason is simple—it is a procedure practically unheard of.

Implicit in the position of the dissent is that proportionality would be served by this dry-run penalty procedure. The dissent uses that proposition as the basis for a repetition of concerns about systemic disproportionality in capital causes, focusing mostly on prosecutorial discretion and plea bargaining, and concluding that standards are badly needed to guide such prosecutorial activities. We agree. As noted in *State v. Koedatich,* 112 *N.J.* 225, 548 *A.*2d 939 (1988),

we strongly recommend that the Attorney General, and the various County Prosecutors, in consultation with the Public Defender, adopt guidelines for use throughout the state by prosecutors in determining the selection of capital

cases. With the assistance of these various participants in the criminal justice system, the state can begin to develop guidelines that not only will promote uniform prosecutorial standards but also may assist the Court in its eventual proportionality review.

[*Id.* at 258, 548 *A*.2d 939.]

Whether this change in plea bargain practice would in fact diminish disproportionality is not known. That question implicates the related question of where disproportionality originates—in prosecutorial or jury decisions. By subjecting the prosecutor's proposed plea bargain to the test of a dry-run penalty proceeding, the judge will add a new factor to the mix, but despite the presumed uniformity of judicial understanding of the death penalty, we have no way of knowing if proportionality is more likely to be achieved than through whatever process prosecutors have been using to reach decisions in this area.

The logical conclusion of the dissent's position is that *all* capital murder plea bargaining must be subjected to this non-binding penalty proceeding.[11] Certainly there is nothing special about this case and no reason, therefore, why Kiett's plea bargain should include it and others' should not. The dissent, incorrectly noting that "the Court is disturbed because under this guilty plea procedure defendants deserving the death penalty will not have that punishment imposed on them," *post* at 509, 582 *A*.2d at 643, apparently believes the procedure will enable more defendants to escape death. Clearly, however, lives are in fact jeopardized by this proceeding if it is extended, as it would have to be, to other defendants. Although the question is not before us, we note that plea bargains that are now fully effected, through which defendants avoid the risk of death without any nonbinding penalty proceeding, would become dependent for their effectiveness on the outcome of a dry-run penalty phase. The court might find that death *is* the appropriate penalty and a defendant who, under present prac-

[11]See dissent at 505, 507, and 508, 582 *A*.2d at 641, 642, and 643.

tice, would have avoided that risk, will now have to go to trial both on guilt and, if convicted, on penalty. The net result, therefore, of wholesale use of this procedure would be fewer completed plea bargains and potentially more executions.

The dry-run penalty proceeding would be a subversion of the capital punishment law. It would take the most solemn judicial proceeding, wherein the decision of life or death is made by a court, and transform it into one that never decides death but decides only whether to accept a plea bargain or force the defendant to trial. It places the judge in a position that can be described only as impossible, for no man or woman can decide whether he or she would in fact impose death by conducting a dress rehearsal of the process with all of the attributes of the real thing except the real thing itself—the determination of life or death. Psychologically and emotionally, the issue simply cannot be duplicated. No person knows what he or she will do when another's life is truly at stake, and the falsity of assuming that the issue can be duplicated in a non-real proceeding is patent. The proceeding degrades the importance and unique- ness of the death penalty. If generally applied, it jeopardizes the effectiveness of plea bargaining. It serves no purpose whatsoever.

## VI.

The death penalty is unique, in result and in procedure. A juvenile who pleaded guilty to capital murder in order to avoid exposure to an inapplicable death penalty may withdraw his guilty plea. We reverse and remand for disposition in accord- ance with this opinion, subject to reinstatement of all charges against defendant except that of capital murder.

HANDLER, Justice, concurring in part and dissenting in part.

The Court decides in this case that defendant may withdraw from a plea agreement because he misunderstood a factor that

was material to his decision to enter the plea. Specifically, the Court holds that because defendant, a juvenile, erroneously believed he was eligible for execution, the State cannot bind him to his guilty plea to capital murder. I concur with that sound judgment.

The Court also concludes, in Points IV and V of its opinion, that New Jersey's capital-punishment scheme cannot tolerate the penalty-phase proceeding employed by the trial court in the plea-bargain procedure below. That procedure allowed the defendant to withdraw his guilty plea and proceed to full trial in the event of a death sentence. The Court's conclusion that this penalty-phase procedure is improper rests in part on its belief that this will not foreclose or discourage plea agreements in capital cases.

Despite the Court's assurances to the contrary, its holding effectively denies capital-murder defendants the option of pleading guilty to capital murder in exchange for a life sentence. The Court's decision virtually eliminates this plea bargain in capital-murder prosecutions. I find no basis for believing that the Legislature intended to foreclose such a plea bargain. Moreover, I have serious reservations that a capital-murder statutory scheme can constitutionally eliminate such an option. I believe that the administration of the death penalty in New Jersey can and should accommodate such plea agreements and, therefore, I dissent from Points IV and V of the majority opinion.

## I.

The indictment in this case charged defendant with several counts, including knowing and purposeful murder by his own conduct. Defendant agreed to plead guilty to capital murder and one other count in exchange for the dismissal of the remaining counts and to submit to a sentencing trial. The prosecutor agreed to allow defendant to withdraw his guilt plea and proceed to a full trial in the event he received a death sentence. The prosecutor also agreed to recommend a sentence

of imprisonment. Defendant then withdrew his earlier plea of not guilty and entered a guilty plea pursuant to the agreement. He then waived his right to a jury for the determination of his sentence and the court proceeded to consider evidence pertaining to aggravating and mitigating factors for the purpose of sentencing.

The court found evidence of three mitigating factors—defendant's age at the time of the offense, *N.J.S.A.* 2C:11–3c(5)(c), the impairment of defendant's ability to conform his conduct to the law as a result of mental disease or defect, *N.J.S.A.* 2C:11–3c(5)(d), and early childhood emotional and physical trauma, admissible under *N.J.S.A.* 2C:11–3c(5)(h). Although the court made no explicit findings regarding aggravating factors, it stated that the aggravating factors did not outweigh the mitigating factors beyond a reasonable doubt. The court sentenced defendant on the capital-murder count to life imprisonment, explaining that the sentence followed careful consideration of the sentencing evidence, accorded with the plea agreement, and served the interests of justice.

It is clear that if the court had concluded that aggravating factors proven beyond a reasonable doubt outweighed the mitigating factors and, therefore, that the sentence should be death, *N.J.S.A.* 2C:11–3c(3)(a), defendant could have withdrawn his guilty plea. Indeed, by its own terms, the agreement was void if the court decided that defendant should receive the death penalty and was binding only if the court decided defendant should be sentenced to a term of imprisonment.

The Court disapproves of the procedure employed by the trial court because, as far as it goes, a determination that defendant should receive a death sentence would not result in the imposition of that penalty. The Court characterizes the sentencing procedure as unreal. *Ante* at 494, 582 *A.*2d at 636. Such a "charade," the Court reasons, undermines both the integrity and the gravity of capital punishment in this State. *Ibid.*

The premise on which the Court constructs this view is faulty. The Court asserts that "[t]he immediate result of this

type of proceeding is that a defendant who pleads guilty to capital murder and, following a penalty proceeding, is sentenced to death will not be executed—indeed the procedure guarantees that he or she will not be executed." *Ante* at 493, 582 *A.*2d at 635 (footnote omitted). That is untrue. What is true is that that death sentence will not be carried out, but there is no "guarantee" that the defendant will not be executed. According to the plea agreement a death sentence resulting from this penalty trial only nullifies the guilty plea, not the capital-murder charges. Defendant may still be executed if, through a subsequent trial, he is found guilty of capital murder and then is sentenced to death following the penalty-phase trial.

The Court nevertheless insists that the penalty-phase trial here served "only as a validation (or rejection) of a previously-agreed-to plea bargain." *Ante* at 494, 582 *A.*2d at 636. That mischaracterizes both the function and the effect of this penalty-trial procedure. The penalty trial in this case resulted in a valid sentence—a life sentence—fully capable of being carried out. There was nothing illusory about that sentence. In addition, the sentence effectuated a material condition of the plea bargain. Neither the function nor effect of the penalty trial impugns the integrity of the sentencing determination.

The plea agreement, which presumably benefitted the State as well as defendant, makes clear that defendant would not plead guilty to capital murder absent a life sentence in return. *Compare, e.g., State v. DiFrisco*, 118 *N.J.* 253, 571 *A.*2d 914 (1990) (defendant pled guilty to capital murder without any promise with respect to sentence); *State v. Davis*, 116 *N.J.* 341, 561 *A.*2d 1082 (1989) (defendant pled guilty to capital murder on hope, though not guarantee, of favorable sentence in return). Whether defendant would receive a death sentence could not be determined without a penalty proceeding as required under *N.J.S.A.* 2C:11–3. The penalty trial determination thus resolves both the appropriate sentence and the enforceability of the plea agreement.

It simply does not follow, as the Court views the matter, that "[t]he court knew that it could not decide whether death was appropriate because, even if it purported to, death wold not be imposed," *ante* at 494, 582 *A*.2d at 636. The penalty proceeding was not conducted only to validate the plea. It served also to determine the sentence. The trial court could and did determine whether death was appropriate. This judgment was independent of the decision whether to accept the plea. The Court acknowledges as much in its observation that "the trial court's determination ... to give effect to the intent of the statute was such that it would not accept a guilty plea even with the prosecutor's consent—it insisted on a hearing to determine for itself whether death was appropriate." *Ante* at 495, 582 *A*.2d at 636. The plea agreement's contingent dependence on that sentence determination does not impugn the determination.

The Court also observes that a penalty proceeding must follow a conviction of capital murder, *N.J.S.A.* 2C:11–3c, and that the prosecutor cannot waive it, *ante* at 494–495, 582 *A*.2d at 636. Here, the prosecutor did not waive the death penalty or penalty-phase trial and the trial court in fact conducted such a trial. The trial court took evidence, considered it, and weighed it to determine the sentence, all in compliance with statutory requirements.

The Court nevertheless concludes that the entire proceeding, including the sentencing trial and determination, was a sham. It finds the trial itself wanting. "The unreality of the proceeding obviously affected the prosecutor, who presented no evidence of the aggravating factors, suggested the court sentence in accordance with a report submitted by defendant, and offered no summation...." *Ibid.* However, the alleged "unreality" of the proceeding is not a result of the plea agreement. Rather, if it exists, it is attributable only to the prosecutor's perceived lack of effort. The plea agreement cannot, however, be blamed for the prosecutor's allegedly inadequate perform-

ance. At any rate, there is nothing to suggest that in recommending to the trial court that the defendant be sentenced to imprisonment, the prosecutor's exercise of discretion was not conscientious, honest, and actuated by an objective assessment of the appropriate sentence. Further, the evidence relating to sentence was relevant and sufficient, and, as with any plea bargain, the trial court was obliged neither to follow the prosecutor's recommendation nor the terms of the plea agreement. Finally, the conformity of the recommended sentence to the plea bargain and defendant's expectations serves neither to invalidate the plea arrangement nor to stigmatize the prosecutor. Its validity inheres solely in the evidence adduced to support it.

The Court assumes that its opinion is consistent with the intent of the Legislature and public policy. I feel the Court's determination virtually disallows capital-murder guilty pleas that are conditioned in part on the imposition of a life sentence. In disallowing this kind of conditional guilty plea, I believe the Court misreads the capital-murder statute and misunderstands the evolution of public policy underlying our death penalty. Indeed, under an ancient death-penalty statute, defendants charged with capital murder were permitted to enter a *non vult* plea, to be followed by the court's "examination of witnesses, to determine the degree of the crime and give sentence accordingly." *State v. Sullivan,* 43 *N.J.* 209, 242, 203 *A.*2d 177 (1964) (describing requirements of *Rev.Stat.* 1874 § 68, p. 145). The degree-of-guilt proceeding hearing served the function of its current counterpart, the sentencing trial; it was necessary because if the court determined that the crime was first-degree murder, it could impose the death penalty. In 1893, however, the Legislature amended the murder statute so that a defendant pleading *non vult* could not be sentenced to death, only imprisoned for life or a term of 30 years (the penalties for first and second degree murder, respectively). *See L.* 1893, *c.* 36; *State v. Ramseur,* 106 *N.J.* 123, 437, 524 *A.*2d 188 (1987) (Handler, J., dissenting) (recounting history of former *non vult*

plea practices). Thus, under the 1874 capital-murder law, the precursor of *N.J.S.A.* 2A:113-3 (repealed 1979), which in turn was replaced by our current Death Penalty Act, the Legislature recognized and indeed authorized that a defendant charged with capital murder could enter a guilty plea on the condition and with the expectation that only a life sentence would be imposed. Although this legislative understanding ultimately foundered on constitutional rocks, this occurred because the legislative scheme unfairly coerced innocent defendants to plead guilty. The invalidity of this practice inhered in the circumstance that the *guilt* determination was invalid, not that the *sentence* was invalid. *See State v. Corbitt*, 74 *N.J.* 379, 378 *A.*2d 235 (1977), *aff'd, Corbitt v. New Jersey*, 439 *U.S.* 212, 99 *S.Ct.* 492, 58 *L.Ed.*2d 466 (1978) (*explaining State v. Funicello*, 60 *N.J.* 60, 286 *A.*2d 55 (1972), *cert. den.* sub nom. *New Jersey v. Presha*, 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972)); *State v. Forcella*, 52 *N.J.* 263,. 245 *A.*2d 181 (1968), *rev'd in part*, 403 *U.S.* 948, 91 *S.Ct.* 2278, 29 *L.Ed.*2d 859 (1971); *United States v. Jackson*, 390 *U.S.* 570, 88 *S.Ct.* 1209, 20 *L.Ed.*2d 138 (1968). There is not the slightest indication that in the checkered history of the administration of the State's capital murder death-penalty statutes, the Legislature has espoused the view now ascribed to it by the Court—that a capital defendant is not entitled to enter into a conditional plea bargain and seek to be sentenced to life imprisonment on the strength of a guilty plea to murder.

In sum, the procedure that was invoked in this case was neither a charade, unauthorized, inconsistent with legislative intent, nor contrary to public policy. The death-penalty statute expressly contemplates the use of guilty pleas in capital-murder prosecutions. *N.J.S.A.* 2C:11-3c(1). In this case, the prosecutor, defense counsel, and trial court followed the procedure detailed in the statute for determination of defendant's sentence.

Further, it is important to acknowledge, as the Court does not, that the procedure followed below is no different from the

plea procedures commonly followed in non-capital cases. We recently reviewed the role of plea bargain procedures in our criminal justice system in *State v. Warren*, 115 *N.J.* 433, 558 *A.*2d 1312 (1989). In that case, we observed that "[f]or some time, the courts have accepted plea bargaining as a legitimate and respectable adjunct of the administration of the criminal laws." *Id.* at 442, 558 *A.*2d 1312. We observed further that a plea bargain, properly conducted, benefits defendants, the State, and the administration of criminal justice.

> The system enables a defendant to reduce penal exposure and avoid the stress of trial while assuring the State that the wrongdoer will be convicted and punished, and that scarce and vital judicial and prosecutorial resources will be conserved through a speedy resolution of the controversy. (citation omitted)
> [*Id.* at 443, 558 *A.*2d 1312.]

In this process, the State waives "important prosecutorial prerogatives," but defendant waives certain constitutional rights, such as the right to jury trial, to counsel, and to present and confront witnesses. *Ibid.* There is nothing invidious or illusory in allowing a defendant to withdraw from a guilty plea if he or she does not obtain a sentence in accordance with the terms of the plea bargain. Indeed, because "defendant's constitutional rights and interests weigh more heavily in the scale" of fundamental fairness under this process, "it is only the defendant who, under the Rules, is entitled to withdraw from a guilty plea if his or her sentencing expectations have been defeated by the imposition of a harsher sentence than that contemplated by the plea agreement." *Ibid. See R.* 3:9–3(e). Thus, under plea procedures authorized by *Rule* 3:9–3, which are fully applicable to capital-murder prosecutions, *see State v. Davis, supra,* 116 *N.J.* 341, 561 *A.*2d 1082, the trial court is not obligated to accept the sentence proposed by the State and agreed to by defendant. If, however, the trial court chooses to ignore the State's recommendation and sentence in excess of the plea, defendant may withdraw the plea and go to trial. The trial court below conformed to these standards.

Further, as noted in *State v. Warren, supra,* 115 *N.J.* at 441 n. 6, 448–49 n. 8, 558 *A.*2d 1312, this Court adopted in June,

1989, an amendment to the Rule governing the role of the trial court in plea negotiations. The Rule now permits the trial court, prior to an agreement and at both parties' request, to announce the maximum sentence it would impose if defendant entered a guilty plea. *R.* 3:9-3(c). The amended Rule thus expressly provides for the trial court's direct participation in the plea procedure prior to the parties' agreement to the terms of the plea. A premise of the new Rule is the confidence that we invest in courts fairly and objectively to determine a lawful and appropriate sentence even though the court has itself previously considered an appropriate sentence and that anticipated sentence itself constitutes a material condition of the plea bargain approved by the court. We recognize that it is salutary to encourage plea bargains, which can genuinely benefit the State and the defendant, that judges can constructively assist the parties by participating in the bargaining process, and, most importantly, that this will not impugn the integrity of a sentence that serves to effectuate such a plea bargain.

## II.

The Court adds a disclaimer to its prohibition against the sentencing determination in the procedure followed in this case. It states: "No implication is intended here about plea bargaining or any aspect of plea bargaining in capital cases other than the holding of an actual penalty proceeding in conjunction therewith." *Ante* at 496, 582 *A.*2d at 637. Intended or not, the implications of this holding for plea bargaining in capital cases are substantial and grave. To say, as the Court does, that "[t]he issue of plea bargaining, as such, in its various forms, is not in any way before us," *ibid.*, is to put on blinders, for the Court proscribes the use of the penalty-phase proceeding here in full view of the issue of plea bargaining in capital cases. Indeed, this case came before the Court on the question of the validity of defendant's guilty plea. I see no escape from the conclusion that the Court's holding effectively eliminates

the possibility of guilty pleas to capital murder in exchange for a life sentence. The Court thus denies defendants—and the State—a useful and statutorily permitted option in capital-murder cases.

Criminal defendants may pursue their lawful defenses as they see fit, and capital-murder defendants should not be denied the same opportunity. For any of a multitude of reasons, defendants may decide that their best interest lies in foregoing a defense against the charges against them in an effort to minimize their penalty within the boundaries of the law. This Court has recognized that criminal defendants, particularly capital-murder defendants, may legitimately concede guilt in the hope that the concession will inure to their benefit in the eyes of the sentencer. *See, e.g., State v. Davis, supra,* 116 *N.J.* 341, 561 *A.*2d 1082. Although the defendant has no right to succeed on this calculated gamble, and although the sentencer is not even obliged to consider it in making a determination, there is no constitutional, statutory, or logical reason why a capital-murder defendant should be precluded from pursuing it. Yet, the Court's holding regarding the penalty-phase proceeding here does just that—it precludes defendant from seeking a particular sentence within the confines of the law in exchange for a guilty plea. The Court now lays down a rule that capital defendants may not legitimately forgo guilt-phase defenses in exchange for a life sentence. The Court's decision effectively discriminates against capital defendants who are willing to offer the State a guilty plea in exchange for securing a particular sentence. Further, and of greater import, the removal of that option unduly increases the chance that defendants charged with capital murder will receive the death penalty. It necessarily adds, I fear, to the risk of arbitrariness and caprice in the administration of the Death Penalty Act.

### III.

Implicit in the Court's refusal to permit this plea procedure is a stronger criticism of more pervasive abuses in our system of

capital punishment. The Court acknowledges, albeit elliptically, the existence of such abuses by its disapproval of the prosecutor's failure to offer evidence of aggravating factors at the penalty proceeding, *ante* at 494, 582 *A*.2d at 636, as well as by its overall view of the procedure as an unsuitable game that undermines the solemnity and integrity of capital sentencing in our State. At base, the Court is disturbed because under this guilty-plea procedure defendants deserving the death penalty will not have that punishment imposed on them, serving to heighten the perception of arbitrary and capricious enforcement of the death penalty. I join the Court in its concern over such abuses in the administration of capital punishment. It chooses the wrong target, however, in selecting the plea bargain procedure in this case as contributing culprit. As earlier noted, I do not agree that the prosecutor did not fulfill his duties in this procedure, and I do not agree that this penalty proceeding was a charade. To the extent, however, that the State disregarded or failed to produce available and relevant evidence concerning the appropriateness of the death penalty, undermining the soundness of the ultimate life sentence, this case suggests not a deficient sentencing proceeding, but, at most, the importance of effective judicial supervision and control over this aspect of the administration of criminal justice. It also provides further evidence of the need to develop a system of guided prosecutorial discretion in the administration of our death penalty. The need for uniform standards is particularly acute in terms of the plea bargaining process in the context of capital-murder prosecutions. *See State v. Gerald,* 113 *N.J.* 40, 155, 549 *A*.2d 792 (1988) (Handler, J., concurring in part and dissenting in part). A proper system of proportionality review would also address the concerns of the Court.

Since this Court first passed judgment on the constitutionality of *N.J.S.A.* 2C:11–3, I have maintained the position that "under constitutional and fundamental-fairness doctrines, our capital murder-death penalty statute [does] not provide sufficient guidance to overcome the genuine risk of arbitrary and

capricious applications." *State v. Matulewicz,* 115 *N.J.* 191, 206, 557 *A.*2d 1001 (Handler, J., concurring) (citing *State v. Ramseur,* 106 *N.J.* 123, 405–06, 524 *A.*2d 188 (1987) (Handler, J., dissenting)). A major component of that risk is the virtually unfettered discretion of prosecutors to select whom to prosecute for capital murder. *DiFrisco, supra,* 118 *N.J.* at 302–05, 571 *A.*2d 914 (Handler, J., concurring in part and dissenting in part); *Matulewicz, supra,* 115 *N.J.* at 207, 557 *A.*2d 1001 (Handler, J., concurring); *State v. Williams,* 113 *N.J.* 393, 458–61, 550 *A.*2d 1172 (1988) (Handler, J., concurring), *Gerald, supra,* 113 *N.J.* at 153, 549 *A.*2d 792 (Handler, J., concurring in part and dissenting in part); *State v. Bey,* 112 *N.J.* 123, 188–90, 548 *A.*2d 846 (Handler, J., dissenting); *State v. Koedatich,* 112 *N.J.* 225, 372–79, 548 *A.*2d 939 (1988) (Handler, J., dissenting); *Ramseur, supra,* 106 *N.J.* at 404–08, 524 *A.*2d 188 (Handler, J., dissenting). As I have previously stated,

> [t]he absence of uniform standards governing prosecutorial discretion heightens the uncertainty and inconsistency in the administration of the capital murder statute. Derivatively, it loosens the guidelines, complicates immeasurably the discretionary responsibility of the [sentencer], and inevitably compounds the risk of arbitrary and capricious death sentences.
>
> [*Gerald, supra,* 113 *N.J.* at 153, 549 *A.*2d 792 (Handler, J., concurring in part and dissenting in part).]

Absent uniform standards to guide prosecutors in the selection of capital defendants,

> the arbitrary enforcement of the death penalty is inevitable because the very pool of people selected to ensure a capital trial at the initial stage of the prosecution is an arbitrarily-composed lot, reflecting determinations by individual prosecutors that may be conscientious but are nonetheless often highly subjective and speculative. *Ramseur, supra,* 106 *N.J.* at 405, 524 *A.*2d 188 (Handler, J., dissenting).
>
> [*Matulewicz, supra,* 115 *N.J.* at 205–06, 557 *A.*2d 1001 (Handler, J., concurring).]

In this case the prosecutor decided to allow defendant to seek to avoid the imposition of the death penalty even though the guilty plea to capital murder suggests defendant's eligibility for that punishment. It is that decision that disturbs the Court and, ironically, illustrates once again the need for guided prosecutorial discretion. In *DiFrisco, supra,* in which the State

sought and procured the death penalty for the defendant while it did not even seek an indictment against the man who hired defendant to commit the murder, I found it "disturbing that the court [was] willing to condone the continued absence of uniform standards to judge prosecutorial decisions to prosecute a homicide as capital murder," 118 *N.J.* at 305, 571 *A.*2d 914 (Handler, J., concurring in part and dissenting in part). I find equally disturbing here the Court's continued condonation of unfettered prosecutorial discretion even as it disapproves of this prosecutor for his decision not to pursue actively a death sentence in this case. There may be situations in which that decision by a prosecutor is reasonable and serves the interests of justice. Whether this is such a situation is unclear. We do not know why the prosecutor preferred not to pursue a death sentence in this case. The need for guided discretion does not imply that plea agreements such as the one in this case should not be permitted. If the death penalty is not to be meted out arbitrarily and capriciously, however, such agreements must be entered into consistently under uniform standards applicable within each county and throughout the State.

The need for uniform standards of prosecutorial discretion in the capital context is closely related to the need for thorough, mandatory proportionality review. *DiFrisco, supra,* 118 *N.J.* at 302–05, 571 *A.*2d 914 (Handler, J., concurring in part and dissenting in part); *Matulewicz,* 115 *N.J.* at 206–09, 557 *A.*2d 1001 (Handler, J., concurring); *Gerald,* 113 *N.J.* at 153–67, 549 *A.*2d 792 (Handler, J., concurring in part and dissenting in part). Properly conducted, proportionality review would expose disparities in prosecutorial practices in potential death-penalty cases. As I have previously noted, there are indications that the prosecution of these cases in our State is arbitrary. *See Matulewicz,* 115 *N.J.* at 208–09, 557 *A.*2d 1001 (Handler, J., concurring); *Gerald,* 113 *N.J.* at 157–66, 549 *A.*2d 792 (Handler, J., concurring in part and dissenting in part). Certainly there is no evidence on which to conclude with confidence that the

selection and prosecution of death-penalty cases in this State is consistent and uniform.

Thorough proportionality review would help to curtail random selection for the death penalty. *Gregg v. Georgia,* 428 *U.S.* 153, 206, 96 *S.Ct.* 2909, 2940, 49 *L.Ed.*2d 859, 893, *reh'g denied,* 429 *U.S.* 875, 97 *S.Ct.* 197, 198, 50 *L.Ed.*2d 158 (1976); *Ramseur, supra,* 106 *N.J.* at 406–08, 524 *A.*2d 188 (Handler, J., dissenting). It may be that this defendant is one who, in comparison with other capital-murder defendants across the state, should not be protected from a possible death sentence, but it may be that he should be. The Court's concern that he should not be protected with the consent of the prosecutor, however, itself seems arbitrary and is presumptuous. We simply have no basis for concluding that the sentence defendant received for the crimes to which he pled guilty was not fitting. His guilty plea, alone or in combination with the State's alleged aggravating factors, does not resolve that question.

I, accordingly, dissent from Points IV and V of the Court's opinion, and concur in balance thereof.

*For reversal and remandment*—CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN, JJ.

*Concurring in part; dissenting in part*—Justice HANDLER—1.