607 A.2d 974

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. KEVIN JACKSON, DEFENDANT-MOVANT.

Decided May 29, 1992.

## ORDER

This matter having been presented to the Court on the applications of defendant for leave to appeal the May 8, 1992, order of the Law Division denying defendant's motion for non-capital sentencing and defendant's alternative motion for an evidentiary hearing (M–1280) and for a stay of trial (M–1281);

And the record having failed to set forth clearly the basis for the charging decision of the Prosecutor in the matter;

And good cause appearing;

It is ORDERED that the motion for leave to appeal (M–1280) is denied; and it is further

ORDERED that the motion for a stay of trial (M–1281) is granted; and it is further

ORDERED that the matter is summarily remanded to the Law Division with direction to the Prosecutor to determine forthwith the charging decision independently, *de novo*, and in accordance with the Guidelines for the Designation of Homicide Cases for Capital Prosecutions, approved by the Attorney General and the County Prosecutors Association; and it is further

ORDERED that the stay shall dissolve, without further Order of the Court, on the Prosecutor's notification to defendant and the trial court of the Prosecutor's charging decision; and it is further

ORDERED that the notice of the charging decision, whether it be to continue to proceed with a capital prosecution or

otherwise, shall be in writing and shall set forth the reasons therefor.

Jurisdiction is not retained.

HANDLER, J., dissenting.

This is the second time that the Court has considered the status of Kevin Jackson's capital prosecution. The case comes before the Court on defendant's motion for leave to appeal from an order of the trial court that the case be prosecuted for capital murder. That order was based on the prosecutor's determination that defendant should not be permitted to plead guilty to non-capital murder.

Defendant was indicted for purposeful or knowing murder, aggravated sexual assault, and third degree theft. On September 19, 1986, defendant pleaded guilty to the murder and theft charges. In the ensuing penalty trial for capital murder, the State relied on aggravating factors c(4)(c) (wantonly vile murder) and c(4)(g) (felony murder). The jury sentenced defendant to death. On appeal, the Court held that the factual basis for the entry of the plea did not establish the requisite intent to kill for capital murder. *State v. Jackson*, 118 *N.J.* 484, 490, 572 *A.*2d 607 (1990).

Thereafter, defendant's original guilty plea was set aside. The State then entered into new plea negotiations. It indicated to defendant and the trial court that it would accept a plea to non-capital murder. That decision was revoked one day later. The State refused to accept a guilty plea to non-capital murder, and determined to prosecute the matter as a capital-murder case and seek the death penalty. As a result, defendant moved to proceed directly with sentencing based on his proffered guilty plea to non-capital murder or to have an evidentiary hearing regarding the State's change of position. The trial court denied that motion, as well as a motion for a stay of the trial. The Appellate Division denied leave to appeal and a stay.

Defendant sought leave to appeal to this Court. He contends that the prosecutor's reversal of the decision not to proceed with a capital trial was arbitrary and capricious, thereby resulting in cruel and unusual punishment. In the alternative, defendant argues that he presented a *prima facie* case of arbitrariness by the prosecutor, and requests an evidentiary hearing in which the prosecutor would be required to state his reasons for reversing his initial decision.

The Court now denies defendant's motion for leave to appeal but stays the trial pending a *de novo* determination by the prosecutor on whether to seek the death penalty against defendant. That determination is to be consistent with the prosecutor's guidelines for capital cases. The Court also orders the prosecutor to place the reasons for that decision on the record.

This case exemplifies and documents the fact that prosecutorial discretion in determining death eligibility under our current capital-murder regime is unprincipled and unguided. Prosecutorial charging practices are so inconsistent and disparate that the end results have become irretrievably arbitrary and capricious. The Court, in my opinion, should grant leave to appeal. It should set clear and objective standards governing the prosecutorial charging responsibility and prescribe firm procedures, including judicial review, to assure that the prosecutorial role in determining death eligibility is soundly, fairly, and consistently exercised.

I

The facts that constitute the basis and the record for defendant's motion for leave to appeal are very disturbing and cannot be glossed over. They appear from the transcript of statements and representations made by counsel and the trial court in the course of the pretrial applications and motions. Some of the statements refer to proceedings held in chambers dealing with the attempts of the State and defendant to reach a plea agreement.

In our earlier decision, we held that defendant's plea failed to establish whether he was guilty of capital or non-capital murder. *Jackson, supra*, 118 *N.J.* at 491, 572 *A.*2d 607. Accordingly, the Court concluded:

> We vacate the sentence of death and remand the matter to the Law Division for further proceedings in accordance with this opinion. A retrial of the guilt phase will be required if the defendant does not plead to capital murder. [*Id.* at 492–93, 572 *A.*2d 607.]

On July 3, 1991, the presiding criminal assignment judge of the vicinage, who had handled the case originally, wrote a letter to counsel. In that letter he purported to set aside the September 19, 1986, guilty plea based on his interpretation of the *Jackson* decision. The case was then transferred to another judge for trial.

The State asserts that it fully intended to seek the death penalty for defendant after the remand of the case by this Court. It appears that while on vacation in Florida, the assistant prosecutor assigned to the case met with the victim's ex-husband, who was the father of the victim's children and the family spokesperson, to elicit the family's feelings or opinion on the case following the reversal of the sentence. The ex-husband stated that the family wanted to pursue a retrial on the penalty phase. The trial court itself requested that the assistant prosecutor contact the family members again regarding their position on whether the State should seek the death penalty on retrial. According to the trial court, it was attempting to see if the case "could be resolved in something short of a second trial seeking the death penalty." When the assistant prosecutor responded that the State would not consider anything but a second penalty trial, the trial court urged the assistant prosecutor to confirm the family's feelings and to decide "once and for all." Accordingly, on or about April 17, 1992, the assistant prosecutor communicated the judge's request to the ex-husband, who said he would discuss it with his family and get back to the assistant prosecutor.

Pretrial motions were set for Monday, April 27, 1992. At about 12:00 p.m. on that day, at the trial court's request, the assistant prosecutor telephoned the ex-husband for his decision. The latter indicated that the family would not be adverse to a sentence of life in prison with a thirty-year parole disqualifier. At 1:30 p.m., the time set for pretrial motions, the trial court conducted a conference in chambers. The assistant prosecutor related that the victim's family had decided to avoid a retrial. The assistant prosecutor also said he would discuss the possibility of a plea agreement with the County Prosecutor and report back that afternoon. Later, the assistant prosecutor informed the trial court and defense counsel that, consistent with the family's wishes, the State would not pursue the death penalty, but that the County Prosecutor wanted to have a letter from the victim's family before proceeding with sentencing. The letter was expected on Wednesday, April 29, 1992. Accordingly, the trial court set the case for a hearing on that date.

However, at approximately 4:30 p.m. on Monday, the presiding criminal assignment judge called a conference in his chambers with the trial judge and both counsel. After being informed of the status of the case, the presiding judge expressed displeasure with the State's position. He commented that if any case deserved the death penalty, it was this one.

Based on the discussions in chambers with the presiding judge, the prosecutor's office reconsidered its position. The next morning, Tuesday, April 28, 1992, the assistant prosecutor notified the trial judge and defense counsel that the State would seek the death penalty. The assistant prosecutor also informed the victim's family of the decision and reported that the ex-husband had assented to that disposition.

Defendant brought a motion on April 29, 1992, challenging the prosecutor's refusal to accept his plea to non-capital murder. He argued that to be administered constitutionally, the death penalty must be sought with uniform established criteria, and that here the criteria were unknown. He contended that

the prosecutor decided not to seek the death penalty on Monday and had reversed that decision on Tuesday when the only changed circumstance was the presiding judge's expression of displeasure with the initial decision. Counsel also mentioned the risk of discrimination because Jackson, a black male, was accused of murdering a white female.

The prosecutor admitted that the offer of life imprisonment had been made on Monday, but argued that because defendant had not accepted it, the State was free to withdraw it on Tuesday. Notwithstanding the victim's family's acquiescence in a tentative decision to forego a second penalty trial, the prosecutor decided that seeking the death penalty "was the right thing to do." In addition, the office was concerned that if it did not seek the death penalty in Jackson's case, which it considered most deserving of the death penalty, it would set an unwanted precedent against securing the death penalty in highly aggravated cases. The prosecutor asserted that his office "complies fully with standing committees on what cases are appropriate to seek the death penalty," but he readily affirmed that the wishes of the victim's family are a consideration.

The trial court denied defendant's motion to be sentenced for non-capital murder. It analyzed the case as if the only issue involved was the alleged withdrawal from a plea agreement. The court concluded that the State had not made an offer because there had been only preliminary discussions between the parties; that any offer had been conditioned on the receipt of a letter from the victim's family and that letter had not been received; that the purported offer had not been accepted by defendant; and that the State had been free to decide to seek the death penalty because there had been no detrimental reliance on the offer by defendant. The court characterized the State's reasons for withdrawing the tentative offer of life imprisonment as a belief that the case was appropriate as a capital case and that accepting a plea for non-capital murder would have set an inappropriate precedent. The court added that there had been no showing of bad faith by the prosecutor.

The trial court also denied any stay of the trial and jury selection proceeded as scheduled on May 4, 1992. Thereafter, the Appellate Division denied leave to appeal, as does this Court.

## II

Prosecutors are vested with initial authority to decide that a defendant deserves to die for his or her crime. Jackson is hardly the first capital defendant to observe that in the exercise of that authority prosecutors are completely unsupervised and their decisions unfathomable. In our first consideration of the constitutionality of our capital-murder statute, we stressed the significance of prosecutorial discretion in determining death eligibility and the disturbing implications arising from the lack of consistency or coherence in the exercise of that discretion. *State v. Ramseur,* 106 *N.J.* 123, 329, 524 *A.*2d 188 (1987). That early general concern over inconsistent prosecutorial charging practices has been a repeated refrain.

In *State v. McCrary,* 97 *N.J.* 132, 478 *A.*2d 339 (1984), and *State v. Matulewicz,* 115 *N.J.* 191, 557 *A.*2d 1001 (1989), defendants claimed that the State had initiated capital prosecutions without any evidence to suggest the presence of aggravating factors. In *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), and *State v. Koedatich,* 112 *N.J.* 225, 548 *A.*2d 939 (1988) (*Koedatich* I), defendants asserted that there were widespread inconsistencies in charging patterns across the state and claimed that those inconsistencies were caused in part by the racial biases of prosecutors. In *State v. Di Frisco,* 118 *N.J.* 253, 571 *A.*2d 914 (1990), a confessed contract killer complained that he had been singled out for capital prosecution when the organized crime boss who allegedly had hired him was never prosecuted for the murder. The most detailed claim of arbitrariness in prosecutorial decisionmaking has come from Robert Marshall, whose death sentence has been affirmed by this Court, *State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991), and

who now seeks reversal of his sentence pursuant to comparative proportionality review. *N.J.S.A.* 2C:11–3e.

The *McCrary* and *Matulewicz* decisions illustrate the risks attendant to unfocused prosecutorial discretion in cases involving equivocal evidence of death-worthiness, cases that arguably should not be prosecuted as capital causes. *Di Frisco* illustrates the unfairness attendant to selective prosecutions, in which one person is charged with capital murder and another equally culpable person is not. The facts of Jackson's case shed light on how abuses of prosecutorial discretion can occur.

Thus far, in response to such claims, the Court has taken relatively small steps to corral prosecutorial discretion. In *McCrary, supra,* 97 *N.J.* 132, 478 *A.*2d 339, it concluded that a defendant served with notice of aggravating factors is entitled to a pretrial hearing in which the State must offer *prima facie* proof of the alleged factors. *McCrary* recognized that defending a capital case, in itself, is an enormous burden, and that it is wrong "for the specter of death to hang over the head of the accused without some basis in fact." *Id.* at 141, 478 *A.*2d 339. Later, in *Matulewicz, supra,* 115 *N.J.* 191, 557 *A.*2d 1001, the Court accepted an interlocutory appeal from a trial court's decision in a *McCrary* hearing. The Court reversed the trial court's ruling and struck an aggravating factor that was unsupported by evidence.

In *Koedatich* I, *supra,* 112 *N.J.* at 258, 548 *A.*2d 939, this Court recommended that the State "adopt guidelines for use throughout the state by prosecutors in determining the selection of cases." The County Prosecutors have in fact adopted such guidelines. *Guidelines for Designation of Homicide Cases for Capital Prosecution (Prosecutors' Guidelines).* They consist of seven one-paragraph guidelines filling just over one and a half double-spaced pages, preceded by a two-page preamble. According to the State, the guidelines are in force in every county. The prosecutor in this case claims compliance with them.

By denying Jackson's motion, the Court appears to uphold the validity and efficacy of those guidelines. The Court not only discounts defendant's meritorious claim that the decision to prosecute him capitally was arbitrary and capricious, it remands the matter with instructions to have the prosecutor follow the guidelines. Apparently the Court believes that none of the compelling circumstances surrounding the case demonstrates arbitrariness or illustrates the kind of misguided and loose decisionmaking that infects all or most capital cases throughout the state. The Court seemingly believes that whatever is wrong with prosecutorial charging practices can be cured simply by having the prosecutor apply the guidelines. The Court's faith is completely unwarranted.

This case demonstrates that the substantive standards of the guidelines are vague and unfocused in that they fail to specify the kind of evidence that is genuinely appropriate to determine death eligibility and death worthiness as a constituent part of the prosecutorial charging function. Further, it shows that the guidelines do not provide effective procedures to assure consistent and sound decisionmaking. Finally, it reveals that the guidelines leave totally unsupervised the exercise of discretion by prosecutors in determining whether defendants should or should not be tried for capital murder. Each of these glaring deficiencies should be addressed squarely by the Court.

### III

The guidelines do not contain specific or clear standards that identify and define the kind of evidence appropriate to determine death eligibility. Indeed, the opposite most truly characterizes the guidelines—they are vague and unfocused, and permit, if they do not encourage, consideration of wholly irrelevant and prejudicial information.

Indicative of just how the ineffectual the guidelines can be is the guidelines' preamble, which concludes with these words:

These guidelines are not intended to, do not, and may not be relied upon to create any substantive or procedural rights, enforceable at law by any party in any matter, civil or criminal. The guidelines do not place any limitation upon the otherwise lawful prosecutorial prerogatives of the Office of the County Prosecutor.

Under Guidelines No. 2 through No. 4, prosecutors must be satisfied that there is proof beyond a reasonable doubt that the defendant is death eligible. Guideline No. 5 provides:

The prosecutor shall consider all known information tending to establish mitigating factors in the case in determining whether or not a case warrants death penalty prosecution.

Guideline No. 6 provides:

If after such review the Prosecutor is satisfied that the State will be able to prove beyond a reasonable doubt that the aggravating factor(s) outweigh the mitigating factor(s) then the case shall be designated a Capital Case.

Under Guideline No. 7, the prosecutor can withdraw notice of aggravating factors, and forego pursuit of the death penalty, if "there is a change in the factual or legal circumstances of the case."

The guidelines were met with a certain degree of skepticism from the moment of their inception. As Justice Stein noted in his separate opinion in *State v. Perry,* the question of whether the guidelines "will prove in practice to be sufficiently specific to overcome the problem of arbitrariness in the designation of cases for capital prosecution, a problem that is addressed currently only in the course of proportionality review of a death sentence that has been affirmed, is uncertain." 124 *N.J.* 128, 186, 590 *A.*2d 624 (1991) (Stein, J., concurring in part and dissenting in part). This case confirms that skepticism.

The guidelines do not foreclose or limit consideration of irrelevant, and, indeed, highly improper and prejudicial, evidence. That is exemplified in this case by the ready resort of the prosecutor—with the encouragement of the trial court—to the wishes of the victim's family with respect to whether defendant deserves to die. Recourse to the wishes of the family was not inadvertent. The prosecutor repeatedly stated that his office is "extremely sensitive to the victims of crime

and their families in making decisions on each individual case, death penalty and otherwise." He told defense counsel that the office was "going to defer to a great extent to the family's desires as to whether or not capital punishment was going to be pursued in this matter again."

For our purposes it is not important that defendant does not challenge the reliance on the wishes of the victim's family as a basis for the prosecutor's decision to seek the death penalty. The victim's surviving kin happened to be merciful. Hence, understandably, defendant describes the consultation with the victim's family as an "obviously proper consideration[ ]." However, any advantage that accrues to defendant cannot validate the feelings and wishes of the victim's family as a proper charging consideration. That information neither adds to nor subtracts from defendant's blameworthiness. If evidence is not clearly related to the statutory factors that focus on blameworthiness, it is not admissible, notwithstanding the breadth of the standards for mitigating factors. *See, e.g., State v. Rose,* 112 *N.J.* 454, 543–44, 548 *A.*2d 1058 (1988) (*Rose I*) (sympathy and compassion inappropriate considerations in sentencing deliberations); *State v. Bey,* 112 *N.J.* 123, 171, 548 *A.*2d 887 (1988) (*Bey III*) (same); *see also Wade v. United States,* —— *U.S.* ——, ——, 112 *S.Ct.* 1840, 1844, 118 *L.Ed.*2d 524 (1992) (indicating that prosecutor's sentencing discretion abused if based on factors "not rationally related to any legitimate Government end").

The heightened protections that apply to the guilt and penalty phases of capital causes apply equally to their charging and pretrial phases. *See, e.g., McCrary, supra,* 97 *N.J.* 132, 478 *A.*2d 339. Hence, the same considerations that stigmatize the use of such evidence to influence a jury's determination of capital guilt or the death sentence impugn its use by prosecutors in determining to charge and prosecute defendants for capital murder. Those considerations were expounded in *State v. Williams,* 113 *N.J.* 393, 550 *A.*2d 1172 (1988) (*Williams II*). There the Court held that the use of inflammatory victim-

impact evidence in a capital trial was improper. The Court explained:

> Any capital trial will necessarily involve testimony and physical evidence pertaining to the victim. This evidence, though admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence. There are occasions when evidence relating to the victim's character and personality may be probative of critical aspects of the trial, *e.g.*, defendant's assertion of self defense or provocation. Where, however, as in the matter before us, the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecution may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury. [*Id.* at 451–52, 550 *A.*2d 1172.]

The Court has cited *Williams II* regularly in condemning what it has seen as inappropriate references before a jury regarding the effect of crimes on victims and victims' families. *See, e.g., Marshall, supra,* 123 *N.J.* at 161, 586 *A.*2d 85; *State v. Harvey,* 121 *N.J.* 407, 425, 581 *A.*2d 483 (1990); *State v. Clausell,* 121 *N.J.* 298, 341, 580 *A.*2d 221 (1990); *State v. Hightower,* 120 *N.J.* 378, 411, 577 *A.*2d 99 (1990); *State v. Pennington,* 119 *N.J.* 547, 570, 575 *A.*2d 816 (1990); *State v. Coyle,* 119 *N.J.* 194, 231, 574 *A.*2d 951 (1990).

The censure of victim-impact evidence in capital causes applies to evidence of the character of the victim, evidence of the effects of the crime on the members of the surviving family, and evidence of the surviving family's opinions on the crime. A foundation of our decision in *Williams II* was the decision of the United States Supreme Court in *Booth v. Maryland,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987). There the Supreme Court invalidated a death sentence returned by a jury for the murder of an elderly couple. The Court found that the jury deliberations had been contaminated in violation of the federal constitution as a result of the reading into the record evidence of a presentence report detailing the personal characteristics of the victims and the emotional impact of the crime on their family. That report also included the opinions of the family members regarding the character of the defendant and punishment he deserved.

In an opinion by Justice Powell, the *Booth* Court initially stated that all evidence considered by the jury during the sentencing phase must have "some bearing on the defendant's 'personal responsibility and moral guilt.'" 482 *U.S.* at 502, 107 *S.Ct.* at 2533, 96 *L.Ed.*2d at 448 (citations omitted) (quoting *Enmund v. Florida*, 458 *U.S.* 782, 801, 102 *S.Ct.* 3368, 3378, 73 *L.Ed.*2d 1140, 1154 (1982)). The Court then held that victim-impact evidence describing the personal characteristics of the victims and the reactions of their families to the crimes "are irrelevant to a capital sentencing decision." *Id.*, 482 *U.S.* at 502–03, 107 *S.Ct.* at 2532, 96 *L.Ed.*2d at 448. Admission of such evidence, said the Court, "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 503, 107 *S.Ct.* at 2533, 96 *L.Ed.*2d at 448. Rejecting the State of Maryland's position that victim-impact evidence and family-reaction evidence must be considered in order to appreciate the full extent of the harm caused by the defendant's actions, the Court said that the requirement of *individualized* sentencing precluded the fact-finder from focusing on anything other than the defendant. *Id.* at 504, 107 *S.Ct.* at 2533–34, 96 *L.Ed.*2d at 449 (citing *Woodson v. North Carolina*, 428 *U.S.* 280, 96 *S.Ct.* 2978, 49 *L.Ed.*2d 944 (1976)). The "focus" of the victim impact evidence, observed the Court, "is not on the defendant, but on the character and reputation of the victim and the effect on his family." *Id.*, 482 *U.S.* at 504, 107 *S.Ct.* at 2534, 96 *L.Ed.*2d at 449. The Court said that because that sort of information "may be wholly unrelated to the blameworthiness of a particular defendant" and may "inflame the jury," it could not be heard by a jury choosing between life and death. *Ibid. Booth* was followed by *South Carolina v. Gathers*, 490 *U.S.* 805, 109 *S.Ct.* 2207, 104 *L.Ed.*2d 876 (1989), in which the Court held that the admission of evidence of the victim's commitment to church and community was error.

In *Payne v. Tennessee*, 501 *U.S.* ——, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), the Supreme Court overruled much of

*Booth* and all of *Gathers.* According to the Court in *Payne,* the *Booth* prohibition against victim-impact evidence "deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for first degree murder." *Id.* at ——, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735. Nevertheless, after *Payne,* there remained from *Booth* its holding that the state may not introduce the opinions of a victim's family regarding the appropriate sentence for the defendant. *Id.* at —— n. 2, 111 *S.Ct.* at 2611 n. 2, 115 *L.Ed.*2d at 739 n. 2. Because the facts of *Payne* did not involve familial testimony before the jury that the defendant deserved to die, the Court expressed no opinion on whether that last surviving remnant of *Booth* would withstand scrutiny in future cases. *Ibid.* That aspect of *Booth,* however, is precisely the aspect most relevant to Jackson's case, for the prosecutor based the decision on whether to prosecute the case capitally in large measure on the opinions of the family. That part of the *Booth* holding remains, and in my view applies to Jackson's case.

Under *Payne,* a state may choose to allow the consideration of victim-impact evidence in capital sentencing without violating the Eighth Amendment, but individual states may retain the *Booth* rule regarding victim-impact evidence under their own laws. 501 *U.S.* at ——, 111 *S.Ct.* at ——, 115 *L.Ed.*2d at 736. As I have stated previously, there is an independent New Jersey State constitutional source for the ban on consideration of victim-impact and family-opinion evidence in capital prosecutions. *See State v. Erazo,* 126 *N.J.* 112, 163, 594 *A.*2d 232 (1991) (Handler, J., concurring in part and dissenting in part); *see also State v. Biegenwald,* 126 *N.J.* 1, 92–93, 594 *A.*2d 172 (1991) (*Biegenwald IV*) (Garibaldi, J., dissenting) (stressing that New Jersey Constitution prohibits the use of victim-impact evidence in capital sentencing). Our Court has taken a strong stand against references to the victim and the victim's family in capital trials, and has relied largely on state rather than federal precedent in doing so. In three of our cases on the subject,

*Hightower, Harvey,* and *Marshall,* the Court cited no federal precedent in support of the proposition that such evidence is inadmissible. Thus, I firmly believe that the Court should hold that the standards followed by the prosecutor in deciding whether to pursue the death penalty against Jackson are unconstitutional.

Another major reason to prohibit consideration of the characteristics and beliefs of the victims and their families must be stressed. Resort to such evidence fosters discrimination by the criminal justice system as a whole. *Booth* itself expressed concern over the assumption implicit in the presentation of victim-impact evidence that some murder victims deserve more sympathy from the legal system than do others. "We are troubled," said the Court, "by the implication that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." 482 *U.S.* at 506 n. 8, 107 *S.Ct.* at 2534 n. 8, 96 *L.Ed.*2d at 450 n. 8. "Of course, our system of justice does not tolerate such distinctions." *Ibid.*

This Court fully subscribes to that thinking. In *Pennington* we stated that a defendant's culpability for capital murder "depends not on whether the victim was a good or bad person, but on the elements of the offense." 119 *N.J.* at 571, 575 *A.*2d 816; *see Williams II, supra,* 113 *N.J.* at 451, 550 *A.*2d 1172. Comments about the victim's family "effectively devalue the deaths of those victims who have no family or those whose relatives are 'less articulate in describing their feelings even though their sense of loss is equally severe.'" *Pennington, supra,* 119 *N.J.* at 570, 575 *A.*2d 816 (quoting *Booth,* 482 *U.S.* at 505, 107 *S.Ct.* at 2534, 96 *L.Ed.*2d at 450). If the poor, unmarried, and socially maladjusted are entitled to equal enforcement of all of our laws, they surely are entitled to equal benefit from the State's efforts to combat violent crime. We do not "regard a crime committed against a particularly virtuous person as more heinous than one committed against a victim whose moral qualities are perhaps less noteworthy or appar-

ent." *Williams II,* 113 *N.J.* at 450, 550 *A.*2d 1172. To sentence a defendant to death because his or her victim happened to have been more admired by society, or more beloved by the victim's own family, or, indeed, because the victim's death is mourned at all is repugnant to our constitutional principles. "The law exists to protect all persons equally." *Ibid.*

The emphasis by prosecutors on the wishes of the family are especially troubling in cases like Jackson's involving black defendants and white victims. In *McCleskey v. Kemp,* 481 *U.S.* 279, 107 *S.Ct.* 1756, 95 *L.Ed.*2d 262 (1987), defendant presented the Supreme Court with a study suggesting that capital defendants in Georgia, where McCleskey's case arose, were much more likely to receive the death penalty if their victims were white. As Randall Kennedy observed in his article McCleskey v. Kemp: *Race, Capital Punishment, and the Supreme Court,* 101 *Harv.L.Rev.* 1388, 1394 (1988), the obvious conclusion to be drawn from the study was that black communities were being "slighted by criminal justice systems that respond more forcefully to the killing of whites than the killing of blacks." The Supreme Court affirmed the death sentence of Warren McCleskey, notwithstanding the fact that his chances of receiving the death sentence were increased because his victim was white. Those concerns have not abated. *See* David C. Baldus, *Death Penalty Proportionality Review Project Final Report to the New Jersey Supreme Court* (September 24, 1991) 100–06 *(Final Report ).*

Given the Supreme Court's rejection of McCleskey's claim, the Court's subsequent rejection of the related victim-oriented-discrimination argument in *Payne, supra,* 501 *U.S.* ——, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720, is not the least bit surprising. Our Court, committed as it is to the eradication of unfair discrimination in the criminal justice system, should not be so unresponsive. *See Wade, supra,* —— *U.S.* at ——, 112 *S.Ct.* at —— (court has authority to review a prosecutor's refusal to file a motion entitling defendant to a lower sentence if decision was based on an unconstitutional motive, such as race). More often

than not, the charging practices followed in Jackson's case lead to the very sort of discrimination evident in *McCleskey*, and although Jackson himself nearly benefited from them, most similarly-situated defendants are not so lucky. *Final Report*, *supra*, at 100–06.

Victim-impact evidence is constitutionally impermissible because it potentially diverts the jury's attention from the primary factors that should control the sentencing decision: the statutory aggravating and mitigating factors. As Justice Garibaldi explained in her dissent in *Biegenwald* IV, *supra*, 126 *N.J.* at 92, 594 *A*.2d 172, the prohibition on victim-impact evidence exists to ensure that jurors will not be so overwhelmed emotionally that they will fail to conduct a "careful balance of evidence ' "regarding the individual characteristics of the defendant and his offense." ' " (quoting *State v. Biegenwald*, 110 *N.J.* 521, 539, 542 *A*.2d 442 (1988) (*Biegenwald III*) (quoting *California v. Ramos*, 463 *U.S.* 992, 1006, 103 *S.Ct.* 3446, 3456, 77 *L.Ed.*2d 1171, 1184 (1983))). Justice Garibaldi aptly observed that certain evidence concerning the status of the victim can be "transformed from lenses through which the jury should examine the defendant into mirrors in which it [would see] the victim." *Id.* 126 *N.J.* at 94, 594 *A*.2d 172. She concluded that "[w]hen the reflection in such a mirror is not related directly to the circumstances of the crime, it has no place at trial." *Ibid.*

Evidence relating to the victim that does not focus on the commission of the crime distorts the standards prescribed by the legislature to govern jury deliberations. We have insisted that such extraneous information unrelated to the statutory aggravating and mitigating factors not be introduced in capital cases. *E.g., State v. Rose*, 120 *N.J.* 61, 64, 576 *A*.2d 235 (1990) (*Rose II*) (views of third persons concerning propriety and efficacy of death sentence inadmissible). Recourse to the punishment preferences of the victim's survivors even more flagrantly flouts the legislative standards governing decisions in capital cases.

Victim-related information is especially disruptive because, as I noted in *Erazo, supra,* 126 *N.J.* at 165, 594 *A.*2d 232, it subtly alters the question presented to the jury by creating a "contest between the defendant and his victim." Implicitly, the jury is asked to decide if the victim was more deserving of life than the defendant is; if the victim was more deserving of life, then the defendant must die as well. Prosecutors may not ask juries "to weigh the comparative grief of the two families," for both the capital-murder statute and the constitution require the consideration of other factors in fixing a sentence. *Ibid.* If prosecutors cannot pose such questions to juries, then surely they cannot pose them to themselves. That constraint is worthless when prosecutors themselves consider victim-impact evidence, most especially if that evidence encompasses the sentencing wishes of the victim's surviving family.

Just as jurors must be guided so that their own personal prejudices do not interfere with their ability to make rational life-and-death judgments, so must prosecutors be guided. The record forcefully proves that the prosecutor functioned without any effective guidance or clear direction and, further, that the current guidelines are not up to the task of redressing that deficiency.

## IV

The procedures or, more precisely, the lack of procedures for structuring the charging decisions of prosecutors further underscore the arbitrariness of the present system. The prosecutor in this case followed his own views on how to resolve the question of defendant's death eligibility. Compounding the problem was the intercession of the presiding judge.

Even if the Prosecutors' Guidelines were followed in every vicinage, the guidelines themselves call for death-eligibility and death-worthiness judgments by individual prosecutors. The preamble to the guidelines states that "[i]t is neither desirable nor acceptable to have a capital charging standard dependent

on individual attitudes." Further, under Guideline No. 1, each county is to set up a committee to review every homicide case "to assist the prosecutor in the prosecutor's determination as to death eligibility." Nevertheless, the guidelines call for each prosecutor to make his or her own judgment about whether the case "warrants" the death penalty. See *Prosecutors' Guideline* No. 5. If he or she thinks that the death penalty is warranted, the prosecutor is further instructed to guess whether the jury would find that the aggravating factors outweigh the mitigating factors. See *Prosecutors' Guideline* No. 6. Of course, to do so the prosecutor must attempt to apply what he or she perceives as the values of juries in the vicinage. The guidelines also authorize the prosecutor to withdraw notice of factors if factual or legal circumstances "change," *Prosecutors' Guideline* No. 7, as can occur whenever the prosecutor, at his or her own discretion, elects to offer the defendant a plea bargain, or whenever, as occurred here, the prosecutor chooses to receive different advice from some outside source.

To the extent that prosecutors' own values vary, prosecutors' good-faith predictions of jury decisions vary, juries' values vary, and plea bargaining practices vary, inconsistency is inevitable. Thus, arbitrariness in charging and, eventually, in sentencing is inescapable even if the guidelines are followed rigorously and conscientiously by every single prosecutor in the state. See *Final Report* table 4 (revealing geographic disparities in capital charging decisions).

In this case, the prosecutor believed that the wishes of the family were important and, indeed, could justify that a defendant not be prosecuted capitally. The prosecutor in *Matulewicz, supra,* 115 *N.J.* 191, 557 *A.*2d 1001, felt that a baby-shaking death was sufficiently wanton and vile to justify the death penalty. The statistical evidence indicates that attitudes vary widely throughout the state on whether certain kinds of homicides justify capital punishment. *See, e.g.,* Leigh B. Bienen *et al., The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion,* 41 *Rutgers L.Rev.* 27,

246–58 (1988) (classification of cases involving stabbing deaths, felony murders, etc., varies greatly from county to county).

It is difficult, but not impossible, to reduce and reconcile the many variables that currently characterize prosecutorial charging throughout the State. The proportionality review study now before the Court compiles data from across the state regarding the sorts of cases that tend to strike juries as deathworthy. See *Final Report* tables 6, 8, 10 and 11. The continued compilation of such information and its consideration by prosecutors under sufficient substantive and procedural standards should bring greater consistency and uniformity to their decisions. The guidelines, however, do not appear to recognize or accommodate the use of such relevant information.

As noted, notwithstanding the prosecutor's decision to forego a capital prosecution, the prosecutor reversed himself after hearing the views of the presiding criminal assignment judge. The intervention of the presiding judge in the proceedings below added to the irregularity of the prosecutor's decision and the volatility of the charging process. We require that critical determinations in the prosecution of capital causes honor the record; evidence and reasons to justify life-and-death decisions must be fully exposed. *E.g., State v. Davis*, 116 *N.J.* 341, 372, 561 *A.*2d 1082 (1989); *id.* at 383–90, 561 *A.*2d 1082 (Handler, J., concurring in part and dissenting in part); *State v. Smith*, 202 *N.J.Super.* 578, 495 *A.*2d 507 (Law Div.1985) (determining that defendant was entitled to discovery on criteria and procedure to select cases prosecuted capitally to support claim that prosecutors' charging decisions were arbitrary and capricious). We have insisted that plea arrangements be carefully structured and meticulously handled. *State v. Kiett*, 121 *N.J.* 483, 493–96, 582 *A.*2d 630 (1990). Minimally, the proper discharge of the charging responsibility requires clear and fair procedures entailing recourse to genuinely probative evidence, integrity of the record, full explanations of determinations, internal review, and centralized coordination and supervision.

Under the circumstances, the unilateral interposition by the presiding judge of his views of the death eligibility of defendant underscored the misdirection and confusion surrounding these charging proceedings. Given the absence of any procedural guidelines to funnel the decisionmaking process, the views of an outside judge constituted an extraneous influence, compounding the arbitrariness of the ultimate result.

## V

I do not dispute the importance, from a separation-of-powers standpoint, of the flexibility of prosecutorial discretion even in capital causes. *See State v. Di Frisco, supra,* 118 *N.J.* at 265–66, 571 *A.*2d 914 (citing *Wayte v. United States,* 470 *U.S.* 598, 607, 105 *S.Ct.* 1524, 1530, 84 *L.Ed.*2d 547, 556 (1985)). We recognized in *Di Frisco,* however, that two important qualifications condition the broad prosecutorial prerogative to determine whether to charge capital murder and seek the death penalty. The first is the defendant's right to a *McCrary* hearing, which we described as a "minimal intrusion into the area of prosecutorial discretion," 97 *N.J.* at 142, 478 *A.*2d 339. We noted that the "portentous consequences" of being eligible for the death penalty warranted greater restrictions on prosecutors than are found in typical criminal cases. *Id.* at 140, 478 *A.*2d 339. The second condition noted in *Di Frisco* is the defendant's right under *N.J.S.A.* 2C:11–3c to proportionality review of death sentences. The message is unmistakable. The death penalty is unlike any other penalties, and separation-of-powers principles do not vest prosecutors with the same kind of discretion to seek it that they have to seek other penalties.

Even in the context of non-capital prosecutions, prosecutorial discretion has its limits. In *State v. Lagares,* 127 *N.J.* 20, 601 *A.*2d 698 (1992), a statute purported to vest prosecutors with unguided discretion in selecting defendants eligible for enhanced sentencing. The Court observed that "[w]ithout standards the prosecutorial decision-making process remains un-

guided, and the danger of uneven application of enhanced sentences increases significantly." *Id.* at 31, 601 *A.*2d 698. To remedy the potential for disparate treatment, the Court construed the statute to require that prosecutors adopt guidelines, to state on the trial court record the reasons for seeking an extended sentence, and to allow judicial intervention when the defendant established that the prosecutor's decision was an arbitrary and capricious exercise of prosecutorial discretion. *Id.* at 32–33, 601 *A.*2d 698; *see also Wade, supra,* —— *U.S.* at ——, 112 *S.Ct.* at 1843 ("a prosecutor's discretion ... is subject to constitutional limitations").

Capital-murder prosecutions are vastly different from any other kind of criminal prosecution. When the discretionary decision has an even more profound impact than in *Lagares,* as assuredly it does in capital prosecutions, the Court should recognize the need to limit the exercise of that discretion. *See also Kiett, supra,* 121 *N.J.* at 494, 582 *A.*2d 630 (recognizing that procedures must directly address capital-murder plea bargaining). It should prescribe firm procedures, including judicial review, to prevent the abusive or arbitrary discharge of the discretionary power vested in the prosecutor.

## VI

All studies conducted to date reveal an alarming and intolerable degree of arbitrariness in prosecutorial decisions in capital causes. That conclusion has been foreshadowed in some of our cases. The study undertaken by Professor Baldus as Special Master for the Court, currently being considered as part of the review that the Court is now conducting in *State v. Marshall,* analyzes every homicide committed in the State since 1982. The Report finds that there were 246 homicides committed during that time that could have been prosecuted as capital cases, but that prosecutors sought the death penalty in only 132 (fifty-six percent) of them. *Final Report* 10. An independent expert retained by the Attorney General's Office, Dr. Herbert

Weisberg, reached virtually identical conclusions. He estimated that 154 of 264 death eligible cases (fifty-eight percent) resulted in capital prosecutions. Herbert I. Weisberg, *Proportionality Review of Death Sentences in New Jersey* (Nov. 26, 1991). Regardless of where this case falls on that spectrum, it illustrates the inconsistency and disparity that surround the exercise of prosecutorial discretion under the capital-murder statute.

When the State relies on the wishes of the family, as the prosecutor did in this case, and when the State defers to the personal opinions of judges who have no direct responsibility over their cases, as it did in this case, then the likelihood of arbitrary and capricious charging in capital cases is magnified.

This case drives home several important lessons: the need to develop and adopt clear and definite substantive standards relating to prosecutorial decisions of death eligibility; the need to establish firm procedures, including central supervision and administration of all prosecutorial-charging functions, to assure a modicum of uniformity and consistency in determining death eligibility; and the need for judicial review of critical charging decisions to assure basic due process, fundamental fairness, and the avoidance of the arbitrariness that results in cruel and unusual punishment.

The Court's remand does not ratify either the decisional factors considered by the prosecutor or his actual application of the guidelines in this case. Nevertheless, I would accept the appeal in this case because the current constraints on the charging authority of prosecutors plainly are inadequate, woefully so, and the risks of arbitrary capital prosecutions are real, manifestly so. I believe that this Court must confront and address these crucial aspects of our capital-murder system.

*For denial*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN— 6.

*Dissenting*—Justice HANDLER—1.